

FILED
NOV 1 4 2019
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

SEALED   unsealed 12/2/19-A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN THE MATTER OF
THE EXTRADITION OF
WILLIAM MITCHELL BOWMAN

Case No.: 19MJ5089

**COMPLAINT**

[UNDER SEAL]

COMPLAINT
(18 U.S.C. § 3184)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1.      In this matter, I represent the United States in fulfilling its treaty obligation to the United Kingdom of Great Britain and Northern Ireland.

2.      There is an extradition treaty in force between the United States and the United Kingdom of Great Britain and Northern Ireland (collectively referenced hereafter as the "Treaty").[1]

---

[1]      Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K., Mar. 31, 2003, S. TREATY DOC No. 108-23 (2004) (the "2003 Treaty"), *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. TREATY DOC. NO. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

\acc

3.      Pursuant to the Treaty, the Government of Scotland, the United Kingdom, has submitted a formal request through diplomatic channels for the extradition of William Mitchell BOWMAN ("BOWMAN").

4.      According to the information provided by the Government of Scotland, the United Kingdom, BOWMAN was charged with lewd, indecent, and libidinous practices, and rape, in violation of the common law of Scotland.  More particularly, BOWMAN has been charged with two (2) counts of rape and two (2) counts of lewd, indecent and libidinous practices and behavior arising from his alleged sexual abuse of his two adopted sisters, EK and KH, over a period of approximately five years from 1963 through 1968. During the period of alleged abuse, victim EK was between ages four and nine, victim KH was between ages three and eight, and BOWMAN was between the ages of thirteen and eighteen.  BOWMAN is also charged with one additional count of lewd, indecent and libidinous practices and behavior towards his adopted brother, RBJ, who was a witness to some of the sexual assaults against his sisters.[2]

5.      These offenses were committed within the jurisdiction of Scotland, the United Kingdom.  In 2010, victim EK reported BOWMAN's alleged crimes to the Police Service of Scotland.   Full statements from victims EK, KH, RBJ and their parents were subsequently taken in September and October 2014 in the United States, where they were residing at the time, pursuant to a Mutual Legal Assistance request from Scotland.   A warrant for BOWMAN's arrest was issued on April 16, 2015, by Sheriff M. S. MacTaggart, Hamilton Sheriff Court, at Hamilton, Scotland.

6.      The warrant was issued on the basis of the following facts:

Minor Victims EK and KH (Counts I-IV)

a. As set forth in the extradition package, and as charged in Counts I and II, victim EK described to law enforcement many instances over a period of

---

[2]      BOWMAN has also been charged with three counts of breach of the peace relating to conduct towards his adopted parents, but extradition is not being sought for these offenses.

several years between 1963 and 1968 (when EK was between the ages of four and nine), when BOWMAN sexually abused and raped her. According to EK, BOWMAN performed oral sex on her, caused her to perform oral sex on him, had sexual intercourse with her, and penetrated her vagina with his fingers. Victim EK also reported that BOWMAN induced other males to rape her, watched other males raping her and masturbated in her presence, and ejaculated onto her body. EK also stated that BOWMAN masturbated while other young males had sex with her and victim KH. EK described the abuse as happening, at times, on a near daily basis.

b. Her detailed descriptions of the accused's conduct is corroborated by the reported accounts and experiences of EK's sister and brother, victims KH and RBJ, as well as admissions made by defendant BOWMAN upon confrontation.

c. KH stated that she remembers an occasion when she saw BOWMAN on top of EK. According to KH, the accused and victim EK were both naked and the accused was having sexual intercourse with victim EK. Victim KH stated that she was 5 or 6 years old when she saw this. On the basis of KH's testimony and age at the time, the incident would have occurred between 1965 and 1967, which is consistent with the timing alleged by victim EK.

d. Victim KH not only corroborates the account of EK but also provides evidence of her own sexual abuse and rape at the hands of BOWMAN, as charged in Counts III and IV. In interviews with law enforcement, KH described BOWMAN raping her and inducing other males to rape her on a regular basis.

e. Victim EK independently corroborates victim KH's account. EK reported to law enforcement that she saw BOWMAN getting into bed with and raping KH on a regular basis. EK also witnessed BOWMAN kissing KH and penetrating KH's mouth with his penis. Additionally, EK stated that

3

BOWMAN asked her to serve as a lookout while he was sexually abusing KH to ensure their father was still occupied playing football.

f. Victim RBJ told the police that he saw his sisters, witnesses EK and KH, lying on beds in an upstairs room when they lived in Scotland. He stated that he recalled boys lying on top of his sisters, while BOWMAN was in the background watching and masturbating.

g. According to KH, she confronted BOWMAN in 2009 about the abuse. According to KH, BOWMAN admitted that he had sex with her and her sister EK when they were children.

h. BOWMAN also made admissions to the father of the victims. The victims' father told police that, after learning of the abuse, he confronted BOWMAN, asking "Did you abuse my girls?" BOWMAN answered "Yes."

Minor Victim RBJ (Count V)

i. RBJ, the brother of victims EK and KH, provided evidence in his police statement that both corroborates his sisters' accounts of sexual abuse by BOWMAN, and supports the charges levied in Count V - BOWMAN's lewd, libidinous practices and behavior towards RBJ by knowingly masturbating in his presence.

j. RBJ told the police that he saw boys lying on top of his sisters, EK and KH, while BOWMAN was in the background watching and masturbating. RBJ stated that he looked at BOWMAN's face and that BOWMAN was looking at him.

k. RBJ believes that he would have been about 5 or 6 years old at the time, which would indicate that the incidents occurred between 1967 and 1969. He stated that he recalls seeing this happen on more than one occasion.

7. The U.S. Marshall's Service has advised me that Bowman's last known address is in Oceanside, California within the Southern District of California.

4

8.     Tom Heinemann, an attorney in the Office of the Legal Adviser of the U.S. Department of State, has provided the U.S. Department of Justice with a declaration authenticating a copy of the diplomatic note by which the request for extradition was made and a copy of the Treaty, stating that the charges of lewd, indecent and libidinous practices and behavior, and rape for which extradition is demanded are provided for by the Treaty, and confirming that the documents supporting the request for extradition are properly authenticated in accordance with Article 9 of the Annex, so as to enable them to be received into evidence.

9.     The declaration from the U.S. Department of State with its attachments, including a copy of the diplomatic note from the United Kingdom, a copy of the Treaty, and the certified documents submitted in support of the request, (marked collectively as Government's Exhibit #1) are filed with this complaint and incorporated by reference herein.

10.     BOWMAN would be likely to flee if he learned of the existence of a warrant for his arrest.

WHEREFORE, the undersigned requests that a warrant for the arrest of the aforenamed person be issued in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and the United Kingdom, so that the fugitive may be arrested and brought before this Court to the end that the evidence of criminality may be heard and considered and that this complaint and the warrant be placed under the seal of the Court until such time as the warrant is executed.

Fred Sheppard
Assistant United States Attorney

Sworn to before me and subscribed in my presence
this 14th day of NOVEMBER , 2019.

Hon. Andrew G. Schopler
United States Magistrate Judge

5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

## E.R.

In forwarding the annexed papers, to be used in support of an application for the surrender from the United States of America of William Mitchell Bowman, who is accused of three counts of lewd, indecent and libidinous practices and behaviour contrary to Common Law, two counts of rape contrary to Common Law and three counts of breach of the peace contrary to Common Law.

I certify that to the best of my knowledge and belief, the signature of The Right Honourable James Wolffe, Queens Counsel, to the depositions, is the signature of The Right Honourable James Wolffe, The Lord Advocate for Scotland having authority to issue and receive the same and I further certify that such documents so signed by an officer having jurisdiction in the place where the same were issued and taken, and authenticated by a Minister of State and sealed with his official seal, would be received in evidence for similar purposes by the tribunals in Great Britain.

**Julian Gibbs**
Extradition Section
Home Office

28 December 2018



## CERTIFICATE OF AUTHENTICATION

IN THE MATTER OF the extradition of WILLIAM MITCHELL BOWMAN born 10 June 1949 from the United States of America to the United Kingdom.

I James Wolffe QC, Lord Advocate for Scotland, do hereby certify:

THAT attached to this Certificate is documentation presented by the United Kingdom in support of the extradition of the said WILLIAM BOWMAN who stands charged in Scotland of the following offences:

1. Lewd, indecent and libidinous practices and behaviour towards Elizabeth Kato or Bowman born 13 July 1959 on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston, Scotland, and at a park nearby;

2. Rape of Elizabeth Kato or Bowman on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby;

3. Lewd, indecent and libidinous practices and behaviour towards Kathleen Hyland or Bowman born 31 August 1960 on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby;

4. Rape of Kathleen Hyland or Bowman on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby;

5. Lewd, indecent and libidinous practices and behaviour towards Richard Bowman Junior born 8 April 1962 on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby;

6. Breach of the peace between 1 January 1963 and 31 December 1963 both dates inclusive at 670 Old Edinburgh Road, Uddingston or 7 Rosebank Drive, Uddingston;

INVESTOR IN PEOPLE
The Scottish Government



7. Breach of the peace between 1 June 1967 and 31 December 1967 both dates inclusive at 670 Old Edinburgh Road, Uddingston or 7 Rosebank Drive, Uddingston;

8. Breach of the peace between 1 March 1968 and 12 July 1973 both dates inclusive at San Pasqual Street, Pasadena, California, USA

THAT the documentation attached to this Certificate is composed of:

1. Extradition request dated 4 December 2018 signed by Helen Knipe, Senior Procurator Fiscal Depute
2. Annexes A-C containing a photograph of William Bowman, a statement from Detective Constable Paul Richardson and a certified copy of the original petition arrest warrant

In my opinion the evidence contained in the aftermentioned documentation discloses the existence of evidence under the law of Scotland that justifies prosecution of the said WILLIAM BOWMAN for the crimes of lewd, indecent and libidinous practices and behaviour, rape and breach of the peace.

In thanking the Competent Authorities of the United States of America in advance for their co-operation in this case, I avail myself of this opportunity to renew the assurance of my high consideration.

The Right Honourable James Wolffe, Queen's Counsel

LORD ADVOCATE

Edinburgh                                    10   December 2018



INVESTOR IN PEOPLE
The Scottish Government

REQUEST FOR EXTRADITION

to

THE COMPETENT JUDICIAL AUTHORITIES
OF THE UNITED STATES OF AMERICA

by

THE RIGHT HONOURABLE JAMES WOLFFE,
QUEEN'S COUNSEL, HER MAJESTY'S
ADVOCATE

for the extradition of

WILLIAM MITCHELL BOWMAN (Date of
Birth 10.06.1949) residing 1165 Ditmar
Street, Oceanside, California, USA

in respect of the following offences:

Lewd, indecent and libidinous practices
and behaviour, rape, and breach of the
peace

## DESCRIPTION OF THE PERSON SOUGHT

1. William Mitchell Bowman (born 10.06.1949) was born in the United
   Kingdom and emigrated to the United States of America in 1968 or
   1969.  He is believed to be currently residing at 1165 Ditmar Street,
   Oceanside, California, USA and had a previous address at 1202 North
   Pacific Street, Unit 105B Oceanside, California, USA. He is believed to
   be married or to have been married to Shelley Smith-Bowman.

2. A photograph of William Bowman was obtained by officers of the
   Police Service of Scotland on an intelligence basis and is attached at
   **Annex A.** This photograph has been shown to one of the victims of
   the alleged offences set out in this request, Kathleen Hyland, who
   has confirmed that the photograph shows the William Bowman who
   was responsible for the offending. A statement from Detective
   Constable Paul Richardson dated 30 October 2018 confirming
   Hyland's identification of accused Bowman is attached at **Annex B.**
   Further intelligence obtained on a police to police basis from the
   United States provides that Bowman's social security number is listed
   as 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 and that he has travelled on British passport
   numbers 154785334 and 030900637.

## STATEMENT OF THE FACTS OF THE OFFENCE

Background

3. William Mitchell Bowman (hereinafter referred to as "the accused" ) is sought for prosecution in Scotland in relation to the following charges:

(001)  on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown did use lewd, indecent and libidinous practices and behaviour towards Elizabeth Kato or Bowman, born 13 July 1959, c/o The Police Service of Scotland, Motherwell, and did repeatedly penetrate her vagina with your fingers, repeatedly perform oral sex on her, repeatedly penetrate her mouth with your penis, repeatedly ejaculate semen onto her body, repeatedly lick her body and repeatedly masturbate in her presence

(002)  on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN did, whilst acting with others whose identities are meantime to the prosecutor unknown, assault Elizabeth Kato or Bowman, born 13 July 1959, c/o The Police Service of Scotland, Motherwell, and did repeatedly lie on top of her and repeatedly penetrate her vagina with your penis and you did rape her

(003)  on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown, did use lewd, indecent and libidinous practices and behaviour towards Kathleen Hyland or Bowman, born 31 August 1960, c/o The Police Service of Scotland, Motherwell, and did repeatedly masturbate in her presence, repeatedly kiss her on her face and repeatedly penetrate her mouth with your penis

(004)  on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN did, whilst acting with others whose identities are meantime to the prosecutor unknown, assault Kathleen Hyland or Bowman, born 31 August 1960, c/o The Police Service of Scotland, Motherwell, and did repeatedly lie on top of her and repeatedly penetrate her vagina with your penis and you did rape her

EXT-BOWMAN-00005

(005)   on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown, did use lewd, indecent and libidinous practices and behaviour towards Richard Bowman Jnr, born 8 April 1962, c/o The Police Service of Scotland, Motherwell, and did repeatedly masturbate in his presence

(006)   Between 1 January 1963 and 31 December 1963 both dates inclusive at 670 Old Edinburgh Road, Uddingston or 7 Rosebank Drive, Uddingston you WILLIAM MITCHELL BOWMAN did conduct yourself in a disorderly manner in that you did press yourself against a bedroom door with Catherine Bowman, c/o The Police Service of Scotland, Motherwell, whilst she was alone within her bedroom and commit a breach of the peace

(007)   Between 1 June 1967 and 31 December 1967 both dates inclusive at 670 Old Edinburgh Road, Uddingston or 7 Rosebank Drive, Uddingston you WILLIAM MITCHELL BOWMAN did conduct yourself in a disorderly manner in that you did look through a window and watch Catherine Bowman, c/o The Police Service of Scotland, Motherwell, whilst she was bathing and commit a breach of the peace

(008)   Between 1 March 1968 and 12 July 1973 both dates inclusive at San Pasqual Street, Pasadena, California, USA you WILLIAM MITCHELL BOWMAN did conduct yourself in a disorderly manner in that you did, whilst naked, enter a room in which Catherine Bowman and Richard Bowman Snr, c/o The Police Service of Scotland, Motherwell, were sleeping, lie on the floor and attempt to remove the bed clothes from the bed in which she was sleeping and commit a breach of the peace

4.   The accused is the adopted brother of the victims Elizabeth Kato or Bowman, Kathleen Hyland or Bowman and Richard Bowman Jnr. He is the adopted son of victims Catherine Bowman and Richard Bowman Snr. The family moved to the USA in 1968.

Events: charges 1 and 2- victim Elizabeth Kato

5.   The sexual abuse started when the accused came to live with the Bowman family in 1963 when he was thrown out of his home by his step mother and was taken in by Catherine Bowman and Richard Bowman Senior. He was eventually legally adopted by Catherine Bowman and Richard Bowman Senior in 1968. The family lived at 670 Old Edinburgh Road, Uddingston and 7 Rosebank, Uddingston, Scotland between 1963 and 1968.

6.   The offending started with the accused telling witness Kato, who was under 10 years old throughout the offending, to "suck him" i.e. put his penis in her mouth, which she did. The accused also performed

oral sex on witness Kato. This happened on a regular basis whilst the family lived in Scotland during the period between July 1963 and 1968.

7. Over a period of time the accused progressed to penetrating witness Kato's vagina with his fingers. He also began to have sexual intercourse with her. He would wait until everyone else had gone to bed before getting witness Kato on the floor, penetrating her vagina with his penis and having sexual intercourse with her. This happened on a regular basis.

8. Kato stated to police that the accused started abusing her but also moved on to sexually abusing her younger sister Kathleen (witness Kathleen Hyland, who was also under 10 years old throughout the offending). The accused asked witness Kato to look out for her father coming whilst he sexually abused witness Hyland. This happened on a regular basis. The accused also took witness Kato out behind the garage or the park near their house where he would have sexual intercourse with her.

9. Witness Kato also described the accused bringing two neighbourhood boys who were around the same age as the accused to the house to have sex with her and her sister, witness Hyland. She states that the accused masturbated whilst the boys had sex with her and her sister. She also states that at times the accused also had sex with her when these other boys were there. She describes instances in which the accused masturbated in her presence. She also describes instances in which the accused ejaculated on her body and in which he would lick her body. Accused promised to give the witness sweets if she kept the abuse a secret. The accused often performed the roll of babysitter for the younger children. Witness Kato states she would sometimes try to get into trouble so her mother would keep a more watchful eye on her.

10. The abuse happened nearly daily throughout the period libeled in the charge and occurred at different times of day or night. All the offending occurred when the witness was under 12 years old.

11. Witness Hyland provided evidence in her statement that she saw the accused having sexual intercourse with witness Kato when they lived in Scotland.

12. The abuse stopped for a brief time as the accused did not go with the family to the US immediately in 1968 but joined them later after his adoption was finalised. The abuse continued when the accused moved to the USA in 1968 or 1969 to join the family and continued until the incident described in charge 8 above involving Catherine Bowman, which happened at some time between the accused's arrival in the USA and 12 July 1973. Richard Bowman Senior threw the accused out after this incident.

- 4 -

13. The witnesses maintained some contact with the accused. Witness Kato speaks to phoning the accused when she was 50 years old and asking him, "Do you remember what you did to me when I was a wee girl?" to which the accused said, "Yes, I'm sorry." Witness Richard Bowman Senior provided evidence in his police statement that he spoke to the accused at some point over the last few years and that the accused answered "Yes" to the question he asked him which was, "Did you abuse my girls?"

Events charges 3 and 4- victim Kathleen Hyland

14. Kathleen Hyland states that when she was 5 or 6 years old (between 31 August 1965 and 30 August 1967 when the accused was aged 16-18 years old) she saw the accused having sexual intercourse with witness Kato and at the same time another male teenager was on top of her (witness Hyland). She also describes that around the same time she remembered being in a field and a boy being on top of her but she did not remember if he engaged in a sexual act with her.

15. Witness Hyland later recalled that the boy she could see on top of her was one of the Clark family or a boy called Gordon. She also stated that she could see the accused on top of her and someone else on top of her sister, witness Kato. Witness Hyland stated that the accused penetrated her vagina with his penis and that this occurred in her bedroom the house at 7 Rosebank Drive, Viewpark, Uddingston. This happened on a regular basis. She stated that the accused brought his friends in and his friends "would do it too."

16. Witness Hyland was under 12 years old throughout the time period of the charge. She remembers the accused having sexual intercourse with her when she was aged between 4 and 6 but did not remember him doing anything else to her. She is able to describe her recollection of the feeling pressure as the accused lay on top of her, his breath on her face and him touching her body. She describes feeling that her brain had almost tried to block out these memories.

17. Her evidence regarding the sexual intercourse is corroborated by the evidence of witness Kato who stated that she saw the accused getting into bed with Hyland and asked witness Kato to look out of the window to check that their father was still playing football. Witness Kato states that she saw the accused having sexual intercourse with witness Hyland in the house at 7 Rosebank Drive, Viewpark, Uddingston. This happened on a regular basis. She describes that she also saw the accused kissing witness Hyland and penetrating her mouth with his penis.

18. Witness Hyland speaks to having maintained some contact with the accused during the 1970s and 1980s when he worked in a bar in Pasadena. She provide evidence in her statement that she contacted the accused by telephone in approximately November 2009 and later in person on an unspecified date and asking him if he had had sex

with her and other family members. She states that the accused told her that he had sex with both her and her sister, witness Kato. She recalls the accused saying, "It's not like we're related," and that he was sorry. Regarding her recollection of someone lying on top of her and witness Kato, witness Hyland states that she asked the accused and he provided her with two names in response – "Gerry Clarke" and "Gordon Crown." Despite enquiries by the Police Service of Scotland it has not been possible to identify the other boys suspected to have sexually abused the victims in this case.

19. Witness Richard Bowman Senior provided evidence in his police statement that he spoke to the accused at some point over the last few years and that the accused answered "Yes" to the question he asked him which was, "Did you abuse my girls?"

### Events charge 5- victim Richard Bowman Junior

20. Richard Bowman Junior states that he can recall seeing his sisters, witnesses Kato and Hyland, lying on beds in an upstairs room when they lived in Scotland. He states that he can recall boys lying on top of his sisters and that the accused would be in the background watching and masturbating. He believes that he would have been about 5 or 6 years old at the time. He states that he recalls seeing this on more than one occasion.

21. Witness Bowman Jnr states that he does not remember the accused ever having sexually abused him directly.

22. Witness Kato corroborates Richard's account in that she states that the accused would masturbate whilst neighbourhood boys would have sex with her and witness Hyland.

### Events charge 6- victim Catherine Bowman

23. Catherine Bowman states that one evening in 1963 there was a bad storm. She heard a noise outside her bedroom door and when she went to investigate she found the accused pressed up against her door. She states that this occurred at 7 Rosebank Drive, Viewpark, Uddingston.

### Events charge 7- victim Catherine Bowman

24. Catherine Bowman describes that on an occasion towards the end of 1967 she was in the bath and saw a figure lingering outside the bathroom window looking into the window. She could tell that the person was looking into the window was the accused and states he stayed there for some time. Witness Bowman confronted accused and asked him what he was doing. The accused told witness

Catherine Bowman that he was taking out some rubbish. This incident occurred at 670 Old Edinburgh Road, Viewpark, Uddingston.

## Events charge 8- victims Catherine Bowman and Richard Bowman Senior

25. In the middle of the night one night approximately 2 or 3 years after the accused arrived in the US to live with the family and before 12 July 1973, Catherine Bowman and her husband Richard Bowman Senior were asleep in bed in their house in California. Catherine Bowman felt the bed clothes moving and being lifted off her. She jumped up. Accused Bowman was lying on the floor beside her bed naked. Witness Catherine Bowman screamed. Her husband Richard Bowman Senior jumped up. The accused ran out of the room. Richard Bowman told the accused to leave the house, which he did. The accused did not see any of the witnesses for several years.

## Police Involvement

26. In 2010 Elizabeth Kato, who lived in Texas at that time, contacted the Police Service of Scotland and reported these offences. She advised she had reported abuse which happened in the US to US police officers, but had been told that no action could be taken due to a statute of limitations which required such offending to be reported within 30 years of the date of the offence.

27. A request was sent by officers of the Police Service of Scotland via Interpol to obtain a statement from witness Kato. A statement was obtained from her on 17 June 2010 by Detective Lieutenant Parra, Universal City Police Department, Texas, US. Crown Office International Co-operation Unit, Edinburgh, Scotland issued an International Letter of Request to the US authorities for full statements to be obtained from Elizabeth Kato or Bowman, Kathleen Hyland or Bowman, Richard Bowman Junior, Catherine Bowman and Richard Bowman Senior. Statements from all of these witnesses were taken by a number of US police officers in September and October 2014 and sent to the Scottish prosecutor.

## APPLICABLE LAW

### Extradition

28. Extradition from the United States of America to the United Kingdom is governed by the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed on 25 June 2003.

### Scots Law

- 7 -

29. Scotland is a separate jurisdiction within the United Kingdom. The criminal law of Scotland is separate and distinct from that of England and Wales. Scotland does not have a penal code. Criminal offences can be offences under the common law or under statute. Common law is an unwritten law, based on custom and usage and developed by case law of the court. The development by case law is known as the doctrine of precedent, whereby the decisions of the higher courts are binding on the lower courts. All the crimes set out in the petition arrest warrant to which this extradition request relates are common law offences. They are not contained in any statutory provisions, but have all long been recognised and punished by the Criminal Courts in Scotland. Offences 1-5 would now be covered by statute, namely the Sexual Offences (Scotland) Act 2009, which applies to offences committed after 1 December 2010.

30. The Lord Advocate, the Right Honourable James Wolffe, Queen's Counsel, is responsible as Public Prosecutor for the investigation of crime in Scotland and the prosecution of all cases on indictment, including those prosecuted in the High Court of Justiciary, Scotland's Supreme Criminal Court which exercises jurisdiction as a trial court. The High Court of Justiciary has sole jurisdiction over rape cases. The Lord Advocate is assisted in the High Court of Justiciary by a number of Advocates Depute.

31. The Sheriff Court as a Criminal Court in Scotland exercises jurisdiction in relation to pre trial procedures in all prosecutions for crime and as a trial court. The competent judge in committal proceedings is the Sheriff. The Petition is the initial writ in solemn proceedings. All criminal proceedings on indictment proceed on the authority of the Lord Advocate.

32. The Procurator Fiscal is the Lord Advocate's local representative and is responsible, as local Public Prosecutor, for the conduct of criminal proceedings before the Sheriff Court, including the preliminary proceedings in cases to be tried in the High Court of Justiciary.

33. Solemn Procedure in Scotland means proceedings before a Sheriff and Jury or before a High Court Judge and Jury. The document which sets out the details of the charge or charges against an accused person is the Petition in committal proceedings and the Indictment in trial proceedings.

34. There is no statute of limitations. In the event that the accused is extradited to Scotland the prosecution will not become time-barred by lapse of time according to the law of Scotland.

EXT-BOWMAN-00011

Petition Warrant

35. The Petition is presented to a Sheriff and sets forth, where the particulars are known, the name, address and date of birth of the accused person, the criminal charges against him or her and craves the Sheriff to grant a warrant for the apprehension of the accused person.

36. In this case the Petition is at the instance of Alasdair Duncan, Procurator Fiscal who was appointed by the Lord Advocate.

37. On 16th April 2015 the Petition was presented to Sheriff M S MacTaggart, Sheriff of South Strathclyde, Dumfries and Galloway at Hamilton who has authority under the law of Scotland to grant petition arrest warrants and granted an apprehension warrant for the accused in connection with charges of lewd, indecent and libidinous practices and behaviour, rape and breach of the peace. The Petition and warrant has been issued to the Police Service of Scotland and remains valid in Scotland and throughout the United Kingdom. A copy of the Petition and warrant is annexed at **Annex C**.

Charges and Applicable Law

38. Charges 1, 3 and 5 are allegations of the crime of lewd, indecent and libidinous practices and behaviour. This is a common law offence and is not contained in any statute. The offence was consolidated into statute in the Sexual Offences (Scotland) Act 2009, but the common law definition applies to offences prior to the coming into force of that Act on 1 December 2010. The crime at common law is lewd, indecent or libidinous practices or behaviour towards children (girls or boys) below the age of puberty, with or without their consent. The age of puberty for girls at common law is 12 years old and for boys at common law it is 14 years old. The definition of lewd, indecent and libidinous practices and behaviour comes from custom and usage, and the doctrine of precedent. According to this definition as developed by the courts, the practices may take the form of touching the child or the accused inducing the child to touch the accused in an indecent manner. Physical contact between the parties is not essential however. Knowingly to engage in indecent contact in the presence of a child will constitute the crime. In order to show that the acts amount to criminal conduct, the Prosecutor must prove that an accused person deliberately engaged in conduct tending to corrupt a child's innocence. An offence of lewd, indecent and libidinous practices and behaviour may also be committed by the taking of indecent photographs of the victim; or by indecent exposure to the victim; or by the showing of indecent photographs or videos to the victim; or by other forms of indecent conduct carried out in the presence of the victim. It may be committed, by means of a lewd conversation with the victim, whether face to face or by a telephone call or through an internet chat-room. In each case, the essence of the offence is the tendency of the conduct to corrupt the innocence of

the victim. The intention of the accused person can be inferred from the circumstances of the case. The ages of the children will require to be proved in court from their evidence and documentary evidence. Evidence will also be led on the basis of which it can be inferred that the accused would have known the children were well below the age of puberty at the time of the offences, namely that the accused had become a member of their family and that they were all significantly below the age of 12 for the girls and 14 for Richard Bowman Junior.

39. The maximum penalty that may be imposed following a conviction on indictment for the crime of lewd, indecent and libidinous practices and behaviour as a common law crime is life imprisonment or an unlimited fine or both.

40. Charges 2 and 4 are charges of rape contrary to the common law. At that time the definition of rape was when a male has sexual intercourse with a female without her consent and where the male knew that the female was not consenting or was reckless as to whether she was consenting.

41. The essential elements which must be corroborated are: penetration of the victim's vagina by the accused's penis, a lack of consent; and mens rea (intention or the accused's state of mind). Penetration of the victim's vagina by the accused's penis need only be minimal and the emission of semen is not required.

42. Lack of consent can be proved in a variety of ways, including the complainer's evidence that she did not consent; evidence that the complainer was forced to have sexual intercourse (proved, for example, by the presence of injuries from which it can be inferred that the victim's will had been overcome by force); evidence that the complainer's was threatened; recent distress exhibited by the victim, attributed to the rape and revealed to the first "natural confidant"; evidence that the complainer was incapable of consenting because she was asleep or was incapable as a result of drug or alcohol, intoxication. However, no girl under the age of 12 has the capacity, in law, to consent to sexual intercourse so lack of consent need not be proved in this case and is established when the age of the victim is proved to be under 12. It must be shown that the accused knew or should have known the ages of the victims. This can be inferred from all the circumstances of the case, including the fact that the accused was a family member and the children were significantly below the age of 12 at the time of the offences.

43. In terms of mens rea, in general terms for the offence of rape the man must know that the woman is not consenting or at least it must be demonstrated that he was subjectively reckless. An alternative formulation for the requisite mens rea is "an absence of honest belief that the woman was consenting." However, again, a girl under the age of 12 does not have the capacity to consent so lack of consent is established by proof of age and that the accused would have known the ages of the girls.

EXT-BOWMAN-00013

44. The maximum sentence if convicted on indictment for the rape offences described in charges 2 and 4 is life imprisonment.

45. Charges 6-8 are offences of breach of the peace. This crime is also a common law offence and is defined as follows: "what is required to constitute the crime is conduct severe enough to cause alarm to ordinary people and threaten serious disturbance to the community.' According to precedent, something substantially greater than mere irritation is involved,' and 'what is required...is conduct which does present as genuinely alarming and disturbing, in its context, to any reasonable person. The offence of breach of the peace is not limited to cases in which there is evidence of actual alarm or annoyance, whether given by the persons who were alarmed or annoyed or by others. The court can determine objectively whether or not the conduct is genuinely disturbing or alarming.

46. The maximum sentence if convicted for a breach of the peace as described in charges 6, 7 and 8 on indictment is life imprisonment.

47. The offending in charge 8 did not occur in Scotland. The charge remains on the arrest warrant to illustrate the event which caused Richard Bowman Senior to throw the accused out of the house. The Scottish Court does not have jurisdiction to consider this offence and as such the accused will not be indicted or prosecuted for it should he be extradited.

48. There are three categories of custodial sentence in Scotland:

49. Short term: this is where the person is sentenced to less than four years imprisonment. This category of prisoner is entitled to be released after serving half of the sentence.

50. Long term prisoners: this is where the person is sentenced to more than four years or more imprisonment. A prisoner may make an application for release to the Independent Parole Board after serving half the sentence. A prisoner receiving a sentence of 4 years or more, where the court has ordered extra supervision for the prisoner, will not be entitled to automatic early release at any point in their sentence. Prisoners receiving sentences of 4 years or more without any court imposed additional supervision become entitled to automatic release only when they have 6 months left on their sentence.

51. Life prisoners: this is where the person is sentenced to life imprisonment. The prisoner may make an application for release to the Independent Parole Board after serving the punishment part of the sentence.

52. In Scotland a life sentence is mandatory where the person is convicted of murder. A life sentence is discretionary where provided for by statute or in relation to exceptionally serious common law

EXT-BOWMAN-00014

offences. If the person is sentenced to life imprisonment, the sentencing judge must impose a "punishment part" which period must be served before the prisoner may apply for parole.

53. Any sentence imposed by a court in Scotland is subject to appeal.

54. An independent Parole Board conducts a review of the prisoner's sentence once the punishment part has been served. A judge chairs this panel. An oral hearing takes place to determine whether the prisoner's detention should continue. The panel must decide whether it is necessary for the protection of the public for the prisoner's detention to continue. At this hearing the prisoner is present.

55. The Parole Board can direct the Scottish Ministers to release the prisoner. If it is decided that the prisoner should not be released then a further hearing will take place within two years to review the prisoner's detention.

56. If satisfied that there are compassionate grounds justifying the release of a person serving a sentence of imprisonment, Scottish Ministers may release him on licence. The Royal Prerogative of Mercy (Clemency) may exceptionally be available.

Procedure on return

57. On his return to the United Kingdom, the accused will appear at Hamilton Sheriff Court in answer to the Petition. He will be committed for further examination and either granted bail or remanded in custody.

58. If the accused is granted bail then he must be served with the Indictment and a preliminary hearing must commence within 11 months of his appearance before the Sheriff. The trial must commence within 12 months of the accused's appearance before the Sheriff. These periods can only be extended if a High Court judge is satisfied that cause has been shown for doing so.

59. If the accused is remanded in custody then he must be brought back before the Sheriff within 8 days of his first appearance. The accused can apply for bail. If bail is granted at this stage, the 11 and 12 month time limits referred to above will apply. If the accused is remanded in custody then the Indictment must be served upon him within 80 days of his committal and; the preliminary hearing must commence within 110 days of his committal and the trial must commence within 140 days of his committal, which failing the accused shall be entitled to be admitted to bail unless a High Court judge is satisfied that cause has been shown to extend the periods referred to.

EXT-BOWMAN-00015

**INFORMATION PROVIDING A REASONABLE BASIS TO BELIEVE WILLIAM BOWMAN COMMITTED THE OFFENCES FOR WHICH EXTRADITION IS REQUESTED**

60. All the evidence in this case comes from the statements provided by the victims describing what happened to them and what they saw happening at the time and, in the case of witnesses Kato and Hyland, and Richard Bowman Senior, admissions the accused has made to them since the offending. In relation to the three witnesses who were children at the time of the offending, aspects of each of their statements corroborates evidence the other two have provided.

**Identification of the accused- all charges**

61. All five witnesses in this case can identify the accused behaving in the manner libelled as he was known to them as a member of their family when the offences were committed.

**Lewd, indecent and libidinous practices and behaviour and penetration of the victim's vagina by the accused's penis**

**Charges 1 and 2- witness Kato**

62. Witness Kato describes many instances over a period of several years between 1963 and 1968 whereby the accused conducted himself in a lewd manner toward her, performed oral sex on her, induced her to perform oral sex on him, induced other males to rape her, watched other males having intercourse with her and masturbated in her presence, ejaculated onto her body, licked her body and penetrated her vagina with his penis. She describes this happening on, at times, a near daily basis. Her descriptions of what the accused did amounts to the actus reus for offences of lewd, indecent and libidinous practices and behaviour and rape.

63. Witness Hyland's evidence supports witness Kato's evidence. Hyland stated that she remembers an occasion when she saw the accused on top of witness Kato. According to Hyland, the accused and witness Kato were both naked and the accused was having sexual intercourse with witness Kato. Witness Hyland states that she was 5 or 6 years old when she saw this. Witness Hyland was born on 31 August 1960. On the basis of Hyland's evidence, the incident occurred between 31 August 1965 and 30 August 1967 which is consistent with witness Kato's account of time frames. Witness Hyland also states that another male teenager was on top of her at the same time when she saw her sister being raped although she could not recall if this male engaged in a sexual act with her (witness Hyland).

64. Witness Hyland states that when she was about 6 or 7 she was in the field across from the family home in Viewpark, Uddingston with witness Kato, the accused, "Gordon" and the "Clark boys" and they had sex with her and witness Kato.

- 13 -

65. Witness Hyland also speaks to the accused admitting to her that he had sex with her and her sister witness Kato when they were children when she spoke to him in 2009.

66. Witness Richard Bowman Senior provided evidence in his police statement that the accused answered "Yes" to the question he asked him- "Did you abuse my girls?" This admission supports the evidence of witness Kato and Hyland that the accused carried out indecent acts of a sexual nature towards them.

67. Witness Richard Bowman Junior provided evidence in his police statement that he saw his sisters, witnesses Kato and Hyland, lying on beds in an upstairs room when they lived in Scotland. He states that he can recall boys lying on top of his sisters and that the accused was in the background watching and masturbating.

68. Witness Richard Bowman Junior believes that he would have been about 5 or 6 years old at the time which would indicate that the incidents occurred between 8 April 1967 and 7 April 1969. He states that he recalls seeing this on more than one occasion. This supports witness Kato's evidence. Witness Bowman Jnr states that he does not remember the accused ever having sexually abused him directly.

**Charges 3 and 4- witness Hyland**

69. Witness Hyland describes the accused acting in a lewd manner towards her, having sexual intercourse with her and inducing other males to have intercourse with her on a regular basis. Her descriptions of the accused actions amount to the actus reus for lewd, libidinous practices and behaviour and rape. Witness Hyland's account of what happened to her is corroborated by the evidence of witness Kato who states that she saw the accused getting into bed with witness Hyland on a regular basis and that the accused asked witness Kato to look out of the window to check that their father was still playing football. Witness Kato states that she saw the accused having sexual intercourse with witness Hyland in the house at 7 Rosebank Drive, Viewpark, Uddingston. She describes that she also saw the accused kissing the witness Hyland and penetrating her mouth with his penis.

70. In support of Hyland's evidence, witness Kato speaks to seeing the accused masturbating whilst other males had sex with her and witness Hyland.

71. Witness Richard Bowman Senior provided evidence in his police statement that the accused answered "Yes" to the question he asked him- "Did you abuse my girls?" This admission supports the evidence of witness Kato and Hyland that the accused carried out indecent acts of a sexual nature towards them.

72. Witness Hyland's evidence is also corroborated by the evidence of her brother Richard Bowman Jnr who states Witness Richard Bowman Junior provided evidence in his police statement that he saw his sisters, witnesses Kato and Hyland, lying on beds in an upstairs room when they lived in Scotland. He states that he can recall boys lying

EXT-BOWMAN-00017

on top of his sisters and that the accused was in the background watching and masturbating. He also stated that sometimes the accused would be on his own on top of witness Hyland.

73. Witness Richard Bowman Junior believes that he would have been about 5 or 6 years old at the time which would indicate that the incidents occurred between 8 April 1967 and 7 April 1969. He states that he recalls seeing this on more than one occasion. This supports witness Kato's evidence.

**Charge 5- Richard Bowman Junior**

74. Witness Richard Bowman Junior provides evidence he saw the accused masturbating whilst other boys were having sexual intercourse with witnesses Kato and Hyland. Witness Kato corroborates Bowman Junior's account in that she states that the accused would masturbate whilst neighbourhood boys would have sex with her and witness Hyland.

**A lack of consent for charges 1-5**

75. As noted above, consent is immaterial for charges 1, 3, and 5 because the victims were young children and irrelevant for the rape charges as the two girls were too young to be able, in law, to provide consent to sexual intercourse. It requires to be proved that the female witnesses were under 12 and the male witness was under 14 and that the accused knew this. The witnesses and their parents can speak to the ages of the children during the period libelled and documentary evidence confirming their ages can be provided. The witnesses were all far below the age of 12 at the time of the offending and the accused was their adopted brother. It can easily be inferred from these circumstances that the accused knew their ages.

**Corroboration using the Moorov Doctrine**

76. Scots Criminal Law requires each essential fact of an offence to be proved by corroborated evidence. The essential facts in relation to each of these offences are that the accused acted in the manner described in the charge, the female children were under 12 and Richard Bowman Junior was under 14 and that the accused intended to act in the manner described in the charge. Intention is inferred from the facts and circumstances of the incident, namely that the accused intended to commit the acts libelled. In addition to separate sources of corroboration using aspects of each witness's statement to corroborate what the other has said, in cases where there are two similar offences committed against different complainers and there is only the evidence of the individual complainer as to each offence, the Prosecutor can use the "Moorov" doctrine, or doctrine of mutual corroboration to prove both of the offences.

EXT-BOWMAN-00018

77. This doctrine has been developed by the courts over a number of years. "Moorov" seeks similarity in time, place and circumstance to mutually corroborate separate offences. The test is whether the individual incidents are component parts of one course of criminal conduct persistently pursued by the accused. The courts have established that a lesser offence can corroborate a more serious offence. Sexual offences over a number of years may constitute a course of criminal conduct allowing for the application of the doctrine. For example, previous case law has allowed the doctrine to apply despite an 18 year gap in offending. In the present case the Prosecutor considers that the Moorov doctrine applies to allow offences 1, 3 and 5 and 2 and 4 to mutually corroborate each other.

**Charges 6-8**

78. Witness Catherine Bowman provides evidence that the accused pressed himself against her bedroom door, lingered outside her bathroom window and lay on the floor of her bedroom naked and removed the covers from her bed. Richard Bowman speaks to the latter incident. These charges have been included to allow Catherine Bowman to explain fully the background circumstances of the family and the accused and to explain what ultimately led to the accused being asked to leave the house. Charge 8 did not occur in Scotland so the Scottish court cannot exercise jurisdiction over this offence. The accused will not be indicted for the offence in charge 8 upon his return.

**EFFORTS TO TRACE AND APPREHEND WILLIAM MITCHELL BOWMAN**

79. The Scottish authorities have been unable to detain the accused because he is believed to be living and working in the United States of America. He is believed to be residing at 1165 Ditmar Street, Oceanside, California, USA and had a previous address at 1202 North Pacific Street, Unit 105B Oceanside, California, USA. He is believed to be married or to have been married to Shelley Smith-Bowman. Intelligence obtained on a police to police basis from the United States provides the photograph from his US driving licence, that his social security number is listed as 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 and that he has travelled on British passport numbers 154785334 and 030900637.

EXT-BOWMAN-00019

80. Enquiries have been made by the Police Service of Scotland who have confirmed that the accused has not returned to the United Kingdom and that he lives and works in the United States of America.

**I confirm that the circumstances herein described, if proved, entitle a criminal court to convict the said William Bowman of the crimes set out in the petition warrant.**

Signed

Helen H Knipe
Senior Procurator Fiscal Depute (Prosecutor)
4 December 2018

## ANNEXES

A- Photograph of the accused
B- Statement of DC Paul Richardson
C- Certified copy of the petition arrest warrant

ANNEX A

## CALIFORNIA DEPARTMENT OF MOTOR VEHICLES
### IMAGE RECORD FOR:

### WILLIAM MITCHELL BOWMAN

| | | | |
|---|---|---|---|
| A5058188 | EXPIRES: 10/06/2010 | CLASS: F | SEX: M |
| HAIR: GRY | EYES: GRN. | HEIGHT: 509 | WEIGHT: 150 |

DATE OF BIRTH: 10/06/1949

ADDRESS: 1202 N PACIFIC ST UNIT 105B, OCEANSIDE, CA 92054

| | | | |
|---|---|---|---|
| PHOTO DATE:<br>09/23/2005 | PHOTO OFFICE:<br>596 | APPLICATION DATE:<br>09/23/2005 | APPLICATION OFFICE:<br>596 |
| ISSUE DATE:<br>N/A | ISSUE OFFICE:<br>N/A | RESTRICTIONS: | |



SIGNATURE:

FINGERPRINT:



This photograph is a true copy of the photograph that is contained on the Department of Motor Vehicles photo database and delivered over the Department of Justice Cal-Photo communications network.

Date: _____ /s/ _____

7

**RESTRICTED**

**STRATHCLYDE POLICE**

Police Ref.

No.  N D 0 1 9 6 0 5 1 2

**DOCUMENTARY PRODUCTION (BACKING SHEET)**

Production Book Ref. No. 3 , 03662/12

PF Ref. No. HM12008260.

**CASE OF**

WILLIAM BOWMAN.

Forensic Lab Ref No. _____

Officer I/C. Case DC RICHARDSON Div  N

Officer Seizing DC RICHARDSON Div  N

Owner _____ POLICE .

Address _____

Tel No. _____

**COURT PRODUCTION NO.**

Signature _____

Case Against/Incident WILLIAM BOWMAN

Description of Article ONE X CALIFORNIA DEPT. OF MOTOR VEHICLES IMAGE RECORD FOR WILLIAM MITCHELL BOWMAN.

Where Found MRO.

At _____ on 16.5. 20 12

Signature(s) or person(s) identifying article.

1 P.A.M _____ 7 _____

2 _____ 8 _____

3 _____ 9 _____

4 _____ 10 _____

5 _____ 11 _____

6 _____ 12 _____

**DIVISION/DEPT.STATION:**

N/OMU / MOTHERWELL.

1:11:3

V2-A0510-P0510

**RESTRICTED**

ANNEX B

**WITNESS STATEMENT**

Witness No: 7          Agency No: PSPND01960512          PF Ref: HM12008260

## SECTION 1: Disclosable Details

| | |
|---|---|
| Surname | : RICHARDSON |
| Forename(s) | : PAUL |
| Age | : 51 |
| Officer URN | : PSP0310037 |
| Rank | : DETECTIVE CONSTABLE |
| Police Station | : GOVAN POLICE OFFICE |
| Years of service | : 19 |

## SECTION 2: Provenance - all mandatory fields

Statement taken by Self.

| | |
|---|---|
| Place, date and time | : Springburn Police Office, 30-10-2018 at 12:47:00 |
| Other person(s) present | : none |
| Source | : operational statement |
| Authentication | : verified by officer as own statement |

## SECTION 3: Free Text

On 29th October 2018 I contacted witness Kathleen Hyland who resides in the United States of America by e-mail.

I e-mailed her a copy of:

Label No - 1 x California Department of Motor Vehicles Image Record for William Mitchell Bowman

The witness Hyland e-mailed me back to confirm that the person depicted in the image is William Mitchell Bowman who is the accused in this case.

I can confirm that this is a true and accurate record.

EXT-BOWMAN-00023

WITNESS STATEMENT

## SENSITIVE MATERIAL - NOT TO BE DISCLOSED

## SECTION 4: Personal Details

SCRO No          : not requested          Witness type  : POLC

Date of birth    : —                      Place of birth  :

Business telephone : 01415324537

## SECTION 5: Dates when unavailable in the next 12 months

22-12-2018 to 06-01-2019
20-06-2019 to 09-07-2019
01-10-2019 to 21-10-2019

## SECTION 6: Any other confidential material

None.

EXT-BOWMAN-00024



ANNEX C



# Hamilton Sheriff Court

Sheriff Court House, 4 Beckford Street, Hamilton, ML3 0BT (9772)

### Backing Sheet (SOLEMN-PETITION)

**HAM-2015-001910**

| | |
|---|---|
| SCS Reference | SCS/2015-047218 |
| PF Ref-Complaint | HM12008260-001 |
| Agency Reference | PSPND01960512 |

| William Mitchell BOWMAN | | | 10/06/1949 | S164721/12X |
|---|---|---|---|---|

| Charge Header | Plea | Verdict | Final Disposal |
|---|---|---|---|
| 1   0LIL000000000000<br>LEWD, INDECENT & LIBIDINOUS PRACTICES &<br>BEHAVIOUR<br>(CHILD, SEXUAL aggravation) | | | |
| 2   0RAP000000000000<br>RAPE<br>(CHILD, SEXUAL aggravation) | | | |
| 3   0LIL000000000000<br>LEWD, INDECENT & LIBIDINOUS PRACTICES &<br>BEHAVIOUR | | | |
| 4   0RAP000000000000<br>RAPE | | | |
| 5   0LIL000000000000<br>LEWD, INDECENT & LIBIDINOUS PRACTICES &<br>BEHAVIOUR | | | |
| 6   0BOP000000000000<br>BREACH OF THE PEACE | | | |
| 7   0BOP000000000000<br>BREACH OF THE PEACE | | | |
| 8   0BOP000000000000<br>BREACH OF THE PEACE | | | |

HAMILTON: 28/11/18
THIS PAGE AND THE FOLLOWING
PAGES CERTIFIED A TRUE
COPY BY ME
SHERIFF CLERK DEPUTE

EXT-BOWMAN-00025

F.10

HM12008260

PSPND01960512

16 April 2015

UNTO THE HONOURABLE SHERIFF OF

SOUTH STRATHCLYDE DUMFRIES & GALLOWAY AT HAMILTON

THE PETITION OF ALISTAIR DUNCAN

PROCURATOR FISCAL OF COURT FOR THE PUBLIC INTEREST

HUMBLY SHEWETH

That from information received by the Petitioner, it appears, and he accordingly charges,

WILLIAM MITCHELL BOWMAN,
1202,
NORTH PACIFIC STREET,
UNIT 105B OCEANSIDE,
California,
UNITED STATES OF AMERICA                    Date of Birth: 10.06.1949

as follows:

(001)    on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown did use lewd, indecent and libidinous practices and behaviour towards Elizabeth Kato or Bowman, born 13 July 1959, c/o The Police Service of Scotland, Motherwell, and did repeatedly penetrate her vagina with your fingers, repeatedly perform oral sex on her, repeatedly penetrate her mouth with your penis, repeatedly ejaculate semen onto her body, repeatedly lick her body and repeatedly masturbate in her presence

(002)    on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN did, whilst acting with others whose identities are meantime to the prosecutor unknown, assault Elizabeth Kato or Bowman, born 13 July 1959, c/o The Police Service of Scotland, Motherwell, and did repeatedly lie on top of her and repeatedly penetrate her vagina with your penis and you did rape her

(003)    on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown, did use lewd, indecent and libidinous practices and behaviour towards Kathleen Hyland or Bowman, born 31 August 1960, c/o The Police Service of Scotland, Motherwell, and did repeatedly masturbate in her presence, repeatedly kiss her on her face and repeatedly penetrate her mouth with your penis

(004)    on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN did, whilst acting with others whose identities are meantime to the prosecutor unknown, assault Kathleen Hyland or Bowman, born 31 August 1960, c/o The Police Service of Scotland, Motherwell, and did repeatedly lie on top of her and repeatedly penetrate her vagina with your penis and you did rape her

Procurator Fiscal Depute

(005)   on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Edinburgh Road, Uddingston and 7 Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown, did use lewd, indecent and libidinous practices and behaviour towards Richard Bowman Jnr, born 8 April 1962, c/o The Police Service of Scotland, Motherwell, and did repeatedly masturbate in his presence

(006)   Between 1 January 1963 and 31 December 1963 both dates inclusive at 670 Old Edinburgh Road, Uddingston or 7 Rosebank Drive, Uddingston you WILLIAM MITCHELL BOWMAN did conduct yourself in a disorderly manner in that you did press yourself against a bedroom door with Catherine Bowman, c/o The Police Service of Scotland, Motherwell, whilst she was alone within her bedroom and commit a breach of the peace

(007)   Between 1 June 1967 and 31 December 1967 both ddates inclusive at 670 Old Edinburgh Road, Uddingston or 7 Rosebank Drive, Uddingston you WILLIAM MITCHELL BOWMAN did conduct yourself in a disorderly manner in that you did look through a window and watch Catherine Bowman, c/o The Police Service of Scotland, Motherwell, whilst she was bathing and commit a breach of the peace

(008)   Between 1 March 1968 and 12 July 1973 both dates inclusive at San Pasqual Street, Pasadena, California, USA you WILLIAM MITCHELL BOWMAN did conduct yourself in a disorderly manner in that you did, whilst naked, enter a room in which Catherine Bowman and Richard Bowman Snr, c/o The Police Service of Scotland, Motherwell, were sleeping, lie on the floor and attempt to remove the bed clothes from the bed in which she was sleeping and commit a breach of the peace

Procurator Fiscal Depute

In order, therefore, that the said Accused may be dealt with according to Law,

MAY it please your Lordship to grant Warrant to officers of Law to search for and apprehend the said Accused WILLIAM MITCHELL BOWMAN

and meantime, if necessary, to detain him in a police station house or other convenient place and to bring him for examination in respect of the above charge(s); thereafter grant Warrant to imprison him within the Prison of HMP Addiewell therein to be detained for further examination or until liberated in due course of Law : Further, to grant Warrant to search the person, repositories, and domicile of the said Accused, and the house or premises in which he may be found, and to secure, for the purpose of precognition and evidence, all writs, evidents, and articles found therein tending to establish guilt or participation in the crime(s) foresaid, and for that purpose to make patent all shut and lockfast places; and also to grant Warrant to cite Witnesses for precognition and to make production for the purposes foresaid of such writs, evidents, and articles pertinent to the case as are in their possession: Further, to recommend to the Judges of other Counties and Jurisdictions to grant the Warrant of Concurrence necessary for enforcing that of your Lordship within their respective territories; or to do further or otherwise as to your Lordship may seem meet.

According to Justice, &c,

Procurator Fiscal Depute

HM12008260

HAMILTON: *16th April 2015* .-The Sheriff having considered the foregoing Petition, grants Warrant to Officers of Law to search for, apprehend, and bring for examination the said Accused WILLIAM MITCHELL BOWMAN and meantime, if necessary, to detain him in a police station or other convenient place, as also to search, secure, and cite for precognition and to open shut and lockfast places, all as craved: Further, recommends Judges of other Counties and Jurisdictions to grant any Warrant of Concurrence necessary for enforcing this Warrant within their respective territories.

**For further**
**Examination**                    20 .-The Sheriff having again considered this Petition, and the said Accused

having intimated that                          do                    not desire to emit a Declaration
on the
**No**                 motion of the Procurator Fiscal, grants Warrant to imprison the said Accused in the Prison of
**Declaration**        therein to be detained for further examination.

**For further**                    20 .-The Sheriff having again considered this Petition and the Declaration of the Accused.
**Examination**

**Declaration**        on the motion of the Procurator Fiscal, grants Warrants to imprison the said Accused in the
                       Prison of                          therein be detained for further examination.

**Bail**                           20...-The Sheriff, on the motion of the Agent of the said Accused and of
                       consent of the Procurator Fiscal, admits the said Accused to bail, and grants Warrant for
                       liberation from Prison on                          finding Caution for further examination or trial in common form,
                       under the penalty of £                          starting.

**For trial**                      20 .-The Sheriff, having again considered this Petition, on the motion of
                       the Procurator Fiscal grants warrant to imprison the said Accused

                       in the Prison of                          , therein be detained until liberated in due course of Law.

**For Trial**                      20 .-The Sheriff, having again considered this Petition and letter in terms of
                       Section 76 of the Criminal Procedure (Scotland) Act 1995, granted
                       by the Agent of the said Accused

**Letter under**
**Section 76**

**No**
**Declaration**        and the said Accused having intimated that                          do                    not desire to
                       emit a Declaration, on the motion of the Procurator Fiscal grants Warrant to imprison the said Accused in the Prison
                       of                          therein to be detained until liberated in due course of Law.

**For trial**                      20 .-The Sheriff having again considered this Petition, Declaration of the said Accused

**Letter under**       and letter in terms of Section 76 of the Criminal Procedure (Scotland) Act, 1995, granted by the
**Section 76**         Agent of the said Accused, on the motion of the Procurator Fiscal grants Warrant to imprison the said Accused in
                       the Prison of                          , therein be detained until liberated in due course of Law.
**Declaration**

SCS Reference:          SCS/2015-047218 / HAM/2015-001910
PF Reference:           HM12008260-001
Police/Agency Reference: PSPND01980512
Hearing Date            16/04/2015

Sheriff Court:    HAMILTON
Date:             16th April 2015
Sheriff:          M.S. MACTAGGART

Accused: WILLIAM MITCHELL BOWMAN - Absent

The Sheriff having considered the foregoing Petition, grants warrant to Officers of Law to search for, apprehend, and bring for examination the said Accused WILLIAM MITCHELL BOWMAN and meantime, if necessary, to detain him in a police station or other convenient place, as also to search, secure, and cite for precognition and to open shut and lockfast places, all as craved: Further, recommends Judges of other Counties and Jurisdictions to grant any Warrant of Concurrence necessary for enforcing this Warrant within their respective territories.

M.S. MACTAGGART
Sheriff

| | |
|---|---|
| SCS Ref: | SCS/2015-047218 |
| Local Ref: | HAM/2015-001910 |
| PF Ref: | HM12008260-001 |
| Police Ref: | PSPND01950512 |
| SCRO No: | S164721/12X |

Sheriff Court:       HAMILTON

AT HAMILTON on 16th April 2015

Following upon the presentation of a criminal petition by the Procurator Fiscal, for the public interest, against

WILLIAM MITCHELL BOWMAN , born 10/06/1949

1202, NORTH PACIFIC STREET, UNIT 105B OCEANSIDE, CALIFORNIA, UNITED STATES OF AMERICA

charging him with

1 – LEWD, INDECENT & LIBIDINOUS PRACTICES & BEHAVIOUR  CHILD, SEXUAL
2 – RAPE  CHILD, SEXUAL
3 – LEWD, INDECENT & LIBIDINOUS PRACTICES & BEHAVIOUR
4 – RAPE
5 – LEWD, INDECENT & LIBIDINOUS PRACTICES & BEHAVIOUR
6 – BREACH OF THE PEACE
7 – BREACH OF THE PEACE
8 – BREACH OF THE PEACE

The Sheriff Granted Warrant to Officers of Law to search for, apprehend and bring for examination the accused persons named in said Petition; and in respect said Petition is required for the minuting of further deliverances of the Court and may not be removed from the custody of the said Court; therefore in terms of the said original warrant on said Petition, Grants Warrant to Officers of Law to search for, apprehend and bring for examination the said WILLIAM MITCHELL BOWMAN

Meantime, Grants warrant, if necessary, to detain the said accused in a police station or other convenient place and also warrant to search, secure and cite for precognitions and to open shut and lockfast places, all as craved: Further, recommends Judges of other Counties and Jurisdictions to grant Warrants of Concurrence necessary for enforcing this Warrant within their respective territories.

M.S. MACTAGGART
Sheriff

Certified a true Extract by

Mark Robb
Clerk of Court

PET_IW                                                                                                           1/1



RECEIVED
OFFICE OF
**Home Office** INTERNATIONAL AFFAIRS

2019 JUN 17 PM 2: 56

CRIMINAL DIVISION

UK Central Authority
Home Office
2nd Floor, Peel Building
2 Marsham Street
London SW1P 4DF

T 020 7035 1256
F 020 7035 6986
**www.homeoffice.gov.uk**

Jason Fischer
International Affairs Specialist
Office of International Affairs
U.S. Department of Justice
1301 New York Avenue NW, Suite 935
Washington, DC 20530
USA

12 June 2019

Dear Jason

## WILLIAM MITCHELL BOWMAN

I enclose a letter from Thomas Crosbie, Procurator Fiscal Depute at the Crown Office and Procurator Fiscal Service, providing additional information in respect of the extradition request for William Mitchell Bowman. This has been sealed and certified by the Secretary of State.

A scanned copy has already been forwarded to you.

Yours sincerely

JULIAN GIBBS
Head of Extradition Casework
julian.gibbs@homeoffice.gov.uk



**INVESTORS
IN PEOPLE**

EXT-BOWMAN-00031            201701081|CRM-95-100-26239

# E.R.

I hereby certify that the document authenticated here under is under the seal of
the Secretary of State and is in support of the request for the surrender of
William Mitchell Bowman.

**Julian Gibbs**
Head of the Extradition Section
Home Office

12th June 2019

# Crown Office and Procurator Fiscal Service

Crown Office, 25 Chambers Street, Edinburgh, EH1 1LA
INTERNATIONAL CO-OPERATION UNIT



FAO Jason Fischer
International Affairs Specialist
Office of International Affairs
U.S. Department of Justice
1301 New York Avenue NW, Suite 935
Washington, DC 20530

Telephone:  +44 (0)131 243 8152
Fax: +44 (0)131 243 8153
coicu@copfs.gov.uk
http://www.crownoffice.gov.uk
Your ref: DoJ No. 182-45794
Our ref: EO/09/15

4th June 2019

Dear Sirs

### Extradition Request for William Mitchell Bowman

I refer to the above extradition request, and write to provide additional information in relation to charge 5 therein. The charge is reproduced at paragraph 3 of the extradition request. It reads as follows:-

*"on various occasions between 13 July 1963 and 29 February 1968 both dates inclusive at 670 Old Eoad, Uddingston and  Rosebank Drive, Uddingston and at a park nearby you WILLIAM MITCHELL BOWMAN, whilst acting with others whose identities are meantime to the prosecutor unknown, did use lewd, indecent and libidinous practices and behaviour towards Richard Bowman Jnr, born 8 April 1962, c/o The Police Service of Scotland, Motherwell, and did repeatedly masturbate in his presence"*

Paragraph 27 of the request describes the obtaining of a full statement from witnesses including Richard Bowman Jnr which were subsequently sent to the Scottish prosecutor.

Paragraph 38 deals with the Scots law applicable to the crime of lewd, indecent and libidinous practices and behaviour and the elements that the prosecutor. It explains that the intention of the accused can be inferred from the circumstances of the case.

Paragraph 20 describes the information provided by Richard Bowman Jnr, but does not describe how the requested person knowingly or deliberately engaged in the conduct towards Richard Bowman Jnr.

For clarity, when asked by Police to describe in detail any incidents he saw which involved the perpetrator and his sister Kay and what the perpetrator did, Richard Bowman Jnr stated:-

*"William was looking at me.  He and a few friends came over.  William was watching his 2 friends on top of his sisters and William was masturbating."*

/This



EXT-BOWMAN-00033
A Department of the Scottish Government

This shows that the conduct of the requested person towards Richard Bowman Jnr as described in charge 5 of the request occurred whilst the requested person was aware of the presence of Richard Bowman Jnr, and as such that it was knowing and deliberate.

Yours faithfully

Thomas Crosbie
Procurator Fiscal Depute



DISTRICT OF COLUMBIA, ss:

<u>DECLARATION OF TOM HEINEMANN</u>

I, Tom Heinemann, declare and say as follows:

1. I am an Assistant Legal Adviser in the Office of the Legal Adviser for the U.S. Department of State, Washington, D.C. This office has responsibility for extradition requests within the Department of State, and I am familiar with the extradition case of William Mitchell Bowman. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the United Kingdom are found in the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, signed 31 March 2003 ("the Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the Government of the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003 (the "Instrument"), signed at London 16 December 2004. The Annex to the Instrument (the "Annex") reflects the integrated text of the operative provisions of the Treaty and the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003. A copy of the Instrument with Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the British Embassy has submitted Embassy Note No. 005/2019, dated January 10, 2019, formally requesting the extradition of William Mitchell Bowman. The Home Office submitted additional information relating to this

19055418-1

# United States of America



## DEPARTMENT OF STATE

### *To all to whom these presents shall come, Greetings:*

...fy That Tom Heinemann, whose name is subscribed to the document hereunto annexed, was
... of subscribing the same Attorney Adviser, Office of the Legal Adviser, Department of
...ed States of America, and that full faith and credit are due to his acts as such.

*This certificate is not valid if it is removed or altered in any way whatsoever*

In testimony whereof, I, Michael R. Pompeo, Secretary of State ,
have hereunto caused the seal of the Department of State to be
affixed and my name subscribed by the Assistant Authentication
Officer, of the said Department, at the city of Washington, in the
District of Columbia, this sixteenth day of August, 2019.

Issued p... to CHXIV, ... of
Sept. 15, ... 1 Stat. 68...
USC 265... ...SC 2651a;
301; 28 ... ...33 et. seq.;
1443(f); R... ...4 Federal R...
Civil Proc...

*Michel R Pompeo*

Secretary of State

By _____

Assistant Authentication Officer,
Department of State

EXT-BOWMAN-00036

-2-

request to the United States Department of Justice by letter dated June 12, 2019. Copies of the diplomatic note and letter are attached to this declaration.

4. In accordance with Article 20 of the Annex, the Government of the United States appears in court in the United States on behalf of, and represents the interests of, the United Kingdom in any proceeding that arises out of a U.K. request for extradition. The United Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The charges of (1) lewd, indecent and libidinous practices and behavior, and (2) rape for which extradition is sought are covered by Article 2 of the Annex.

6. The charges of breach of the peace for which extradition is sought are not forwarded to the court for consideration.

7. Under Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition proceedings without further certification, authentication, or other legalization. Therefore, such documents satisfy the authentication requirements without the need for certification by the U.S. Embassy in London. The United Kingdom, in submitting documents in the instant case that bear the certificate or seal of the Home Office, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on August 16, 2019.

_____
TOM HEINEMANN

Attachments:

   1. Copy of Note and letter.
   2. Copy of Instrument with Annex.



**British Embassy
Washington**

L/LEI

2019 JAN 11 A 11: 16

DEPARTMENT OF STATE

Embassy Note No:- 005/2019

**REQUEST FOR THE EXTRADITION OF WILLIAM MITCHELL BOWMAN FROM THE UNITED
STATES OF AMERICA TO SCOTLAND.**

Her Britannic Majesty's Embassy presents its compliments to the Department of State and
encloses documents in support of the extradition from the United States of America of
WILLIAM MITCHELL BOWMAN.

His extradition is sought under the UK-US Extradition Treaty 2003, as amended, as a person
accused of the following offences:

- 3 charges of lewd, indecent and libidinous practices and behaviour contrary to the
  common law;

- 2 charges of rape contrary to the common law;

- 3 charges of breach of the peace contrary to the common law.

The Embassy would be grateful if the enclosed papers could be transmitted as soon as
possible to the appropriate authorities with a request for the extradition of WILLIAM
MITCHELL BOWMAN to Scotland.

The United Kingdom police investigation indicates that he may be residing at 1165 Ditmar
Street, Oceanside, California, USA.

In the event of his return being ordered the Embassy would appreciate being notified as
soon as possible so that arrangements can be made for his prompt return to Scotland.

Her Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.



**British Embassy, Washington DC**

**10 January 2019**

EXT-BOWMAN-00039



RECEIVED

OFFICE OF
INTERNATIONAL AFFAIRS

2019 JUN 17  PM 2: 56

CRIMINAL DIVISION

 Home Office

UK Central Authority
Home Office
2nd Floor, Peel Building
2 Marsham Street
London SW1P 4DF

T. 020 7035 1256
F 020 7035 6986
www.homeoffice.gov.uk

Jason Fischer
International Affairs Specialist
Office of International Affairs
U.S. Department of Justice
1301 New York Avenue NW, Suite 935
Washington, DC 20530
USA

12 June 2019

Dear Jason

**WILLIAM MITCHELL BOWMAN**

I enclose a letter from Thomas Crosbie, Procurator Fiscal Depute at the Crown Office and Procurator Fiscal Service, providing additional information in respect of the extradition request for William Mitchell Bowman. This has been sealed and certified by the Secretary of State.

A scanned copy has already been forwarded to you.

Yours sincerely

**JULIAN GIBBS**
Head of Extradition Casework
julian.gibbs@homeoffice.gov.uk



EXT-BOWMAN-00040

20170108 | CRM-95-100-26239

Instrument as contemplated by Article 3(2) of the Agreement on Extradition
between the United States of America and the European Union signed 25 June 2003, as
to the application of the Extradition Treaty between
the Government of the United States of America and the Government of the
United Kingdom of Great Britain and Northern Ireland signed 31 March 2003

1.      As contemplated by Article 3(2) of the Agreement on Extradition between the
United States of America and the European Union signed 25 June 2003 (hereafter "the
Extradition Agreement"), the Governments of the United States of America and the
United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance
with the provisions of this Instrument, the Extradition Agreement is applied in relation
to the bilateral Extradition Treaty between the Government of the United States of
America and the Government of the United Kingdom of Great Britain and Northern
Ireland signed 31 March 2003 (hereafter "the 2003 Extradition Treaty") under the
following terms:

a)      Article 5(1) of the Extradition Agreement shall be applied as set forth in
Article 8(1) and 12(4) of the Annex to this Instrument to provide for the mode of
transmission of the extradition request and supporting documents;

b)      Article 5(2) of the Extradition Agreement shall be applied as set forth in
Article 9 of the Annex to this Instrument to provide for the requirements concerning
certification, authentication or legalization of the extradition request and supporting
documents;

c)      Article 7(1) of the Extradition Agreement shall be applied as set forth in
Article 12(4) of the Annex to this Instrument to provide for an alternative method for
transmission of the request for extradition and supporting documents following
provisional arrest;

d)      Article 8(2) of the Extradition Agreement shall be applied as set forth in
Article 10(2) of the Annex to this Instrument to provide for the channel to be used for
submitting supplementary information;

e)      Article 10 of the Extradition Agreement shall be applied as set forth in
Article 15 of the Annex to this Instrument to provide for the decision on requests made
by several States for the extradition or surrender of the same person; and

f)      Article 14 of the Extradition Agreement shall be applied as set forth in Article
8 bis of the Annex to this Instrument to provide for consultations where the Requesting
State contemplates the submission of particularly sensitive information in support of a
request for extradition.

2.      The Annex reflects the integrated text of the operative provisions of the
2003 Extradition Treaty and the Extradition Agreement that shall apply upon entry into
force of this Instrument.

3.a)   This Instrument shall apply to the United States of America and to Great Britain and
Northern Ireland.  Subject to subparagraph b), the application of the 2003 Extradition Treaty to
the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which

the 2003 Extradition Treaty may apply in accordance with its terms, shall remain unaffected by the Extradition Agreement and this Instrument.

b)    This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 20(1) (b) of the Extradition Agreement, agree to extend its application thereto. The exchange of notes shall specify the authority in the territory responsible for the measure set forth in Article 9 of the Annex and the channels between the United States of America and the territory for transmissions pertaining to the extradition process, in lieu of those designated in the Annex. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel, where duly confirmed between the United States of America and the United Kingdom in accordance with Article 20(2) of the Extradition Agreement.

4.    In accordance with Article 16 of the Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

5.    This Instrument shall not apply to requests for extradition made prior to its entry into force.

6.    (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the Extradition Agreement.

(b)    In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16ᵗʰ day of December 2004.

FOR THE GOVERNMENT OF
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF
THE UNITED KINGDOM OF GREAT
BRITAIN AND NORTHERN IRELAND:

2

## ANNEX

### EXTRADITION TREATY
### BETWEEN
### THE GOVERNMENT OF THE UNITED STATES OF AMERICA
### AND
### THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

## TABLE OF CONTENTS

| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Statute of Limitations |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Sensitive Information in a Request |
| Article 9 | Authentication of Documents |
| Article 10 | Additional Information |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition or Surrender Made by Several States |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Waiver of Extradition |
| Article 18 | Rule of Specialty |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Termination |

3

EXT-BOWMAN-00043

## Article 1
### Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

## Article 2
### Extraditable Offenses

1. An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2. An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3. For the purposes of this Article, an offense shall be an extraditable offense:

   (a) whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

   (b) whether or not the offense is one for which United States *federal* law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4. If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5. If extradition has been granted for an *extraditable* offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

4

Article 3
Nationality

Extradition shall not be refused based on the nationality of the person sought.

Article 4
Political and Military Offenses

1.    Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2.    For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a)    an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b)    a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c)    murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d)    an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e)    placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f)    possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(g)    an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any of the foregoing offenses.

3.    Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated. In the United States, the executive branch is the competent authority for the purposes of this Article.

5

4.     The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law. In the United States, the executive branch is the competent authority for the purposes of this Article.

## Article 5
### Prior Prosecution

1.     Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2.     The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested.

3.     Extradition shall not be precluded by the fact that the competent authorities of the Requested State:

(a)     have decided not to prosecute the person sought for the acts for which extradition is requested;

(b)     have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

(c)     are still investigating the person sought for the same acts for which extradition is sought.

## Article 6
### Statute of Limitations

The decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

## Article 7

### Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed, or, if imposed, will not be carried out.

6

## Article 8
### Extradition Procedures and Required Documents

1. All requests for extradition shall be submitted through the diplomatic channel.

2. All requests for extradition shall be supported by:

    (a) as accurate a description as possible of the person sought, together with any other information that would help to establish identity and probable location;

    (b) a statement of the facts of the offense(s);

    (c) the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

    (d) the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested; and

    (e) documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3. In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall be supported by:

    (a) a copy of the warrant or order of arrest issued by a judge or other competent authority;

    (b) a copy of the charging document, if any; and

    (c) for requests to the United States, such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.

4. In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall be supported by:

    (a) information that the person sought is the person to whom the finding of guilt refers;

    (b) a copy of the judgment or memorandum of conviction or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

    (c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

7

(d)    in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

### Article 8 bis
### Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

### Article 9
### Authentication of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

### Article 10
### Additional Information

1.    If the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

2.    Such additional information may be requested and furnished directly between the United States Department of Justice and the Home Office.

### Article 11
### Translation

All documents submitted under this Treaty by the Requesting State shall be in English or accompanied by a translation into English.

### Article 12
### Provisional Arrest

1.    In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition.  A

8

request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and such competent authority as the United Kingdom may designate for the purposes of this Article.

2. The application for provisional arrest shall contain:

(a) a description of the person sought;

(b) the location of the person sought, if known;

(c) a brief statement of the facts of the case including, if possible, the date and location of the offense(s);

(d) a description of the law(s) violated;

(e) a statement of the existence of a warrant or order of arrest or a finding of guilt or judgment of conviction against the person sought; and

(f) a statement that the supporting documents for the person sought will follow within the time specified in this Treaty.

3. The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4. A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8. For this purpose, receipt of the formal request for extradition and supporting documents by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

5. The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

### Article 13
### Decision and Surrender

1. The Requested State shall promptly notify the Requesting State of its decision on the request for extradition. Such notification should be transmitted directly to the competent authority designated by the Requesting State to receive such notification and through the diplomatic channel.

9

EXT-BOWMAN-00049

2.    If the request is denied in whole or in part, the Requested State shall provide reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3.    If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4.    If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

## Article 14
### Temporary and Deferred Surrender

1.    If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. If the Requested State requests, the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States.

2.    The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

## Article 15
### Requests for Extradition or Surrender Made by Several States

1.    If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2.    If the United Kingdom receives an extradition request from the United States and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3.    In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

10

(a)    whether the requests were made pursuant to a treaty;
(b)    the places where each of the offenses was committed;
(c)    the respective interests of the requesting States;
(d)    the seriousness of the offenses;
(e)    the nationality of the victim;
(f)    the possibility of any subsequent extradition between the requesting States; and
(g)    the chronological order in which the requests were received from the requesting States.

## Article 16
### Seizure and Surrender of Property

1.    To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.    The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

## Article 17
### Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

## Article 18
### Rule of Specialty

1.    A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)    any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense on which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b)    any offense committed after the extradition of the person; or

(c)    any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the

11

EXT-BOWMAN-000051

person's detention, trial, or punishment. For the purpose of this subparagraph:

    (i)    the executive authority of the Requested State may require the submission of the documentation called for in Article 8; and

    (ii)    the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

2.    A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of the person to a third State, if the person:

    (a)    leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

    (b)    does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

4.    If the person sought waives extradition pursuant to Article 17, the specialty provisions in this Article shall not apply.

### Article 19
### Transit

1.    Either State may authorize transportation through its territory of a person surrendered to the other State by a third State or from the other State to a third State. A request for transit shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit shall be detained in custody during the period of transit.

2.    Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.

12

EXT-BOWMAN-00052

### Article 20
### Representation and Expenses

1.      The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2.      The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3.      Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

### Article 21
### Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

### Article 22
### Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

13

EXT BOWMAN 00059

**EMBASSY OF THE**
**UNITED STATES OF AMERICA**

No. 120

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honor to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
    London, England.  December 16, 2004



The Consular Directorate of the Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Embassy's Note No. 120 of 16 December 2004 which reads as follows:

"The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honour to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the United States of America and the Government of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

EXT-BOWMAN-00055

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honour to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of this opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration."

In reply, the Foreign and Commonwealth Office has the honour to confirm that the proposal set out in the Embassy's Note is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that the Embassy's Note, and this Reply, shall constitute an agreement between the two Governments which shall enter into force on the date of entry into force of the Instrument.

The Consular Directorate of the Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

London
16 December 2004